We will hear argument this morning in Case 19-14-42, Carr v. Saul and the Consolidated Case. Ms. Harris? Mr. Chief Justice, and may it please the Court, Social Security claimants do not need to challenge the constitutionality of their ALJ's appointments and ALJ proceedings to obtain judicial review of that issue. First, under Simmons v. Apfel, when an agency holds non-adversarial proceedings and does not depend on parties to identify the issues, courts should not imply an issue exhaustion requirement on their own. Simmons declined to imply an issue exhaustion requirement for appeals counsel proceedings and invited the SSA to promulgate such a rule, but the agency never did. Twenty years later, appeals counsel and ALJ proceedings are still non-adversarial and informal. Both conduct a plenary review and must develop arguments for and against benefits. Indeed, the appeals counsel must spot even errors that claimants didn't raise to ALJs. Courts should not penalize claimants when the agency itself does not care what claimants raised to ALJs and has never notified them of an issue exhaustion requirement. Second, the government relitigates Simms, which rejected the government's universal default rule of issue exhaustion. Simms also rejected the government's concern that courts would be stymied by applying Social Security regulations to technical, fact-based questions the agency hasn't considered. Under Simms, courts routinely entertain fact-heavy issues that the agency never passed upon because the error first appeared in the ALJ's decision and the claimant didn't raise it to the appeals counsel. Third, at very least, this court should not require claimants to exhaust Appointments Clause challenges. Constitutional questions are beyond the agency's competence and raising the Appointments Clause was futile. The government knew about the Appointments Clause problem, didn't fix it, and barred ALJs from considering it. I welcome questions. Ms. Harris, under your theory, what would prevent a claimant from arguing before the leg injury and then arguing for the first time in district court that he also has a back injury so that he can get a second bite at the apple to recover an award? Well, I think 20 CFR 404.1512 would squarely prohibit that because the burden is on the claimants to establish disability and that includes raising impairments. So while the ALJ has the duty to develop all the facts, there is a bar on raising new evidence or a new round of disability in court for the first time. And I think that's something that just goes to show there are a lot of guardrails already built into the nature of the Social Security judicial review scheme that ensure that courts are not going to be inundated with any sort of technical questions that are beyond their ken that the agency needed to weigh in on first. And other guardrails include things like the 405G textual standard that prohibits in general claimants from raising new evidence in court for the first time. The substantial evidence standard under which courts affirm the ALJ if there's more than a mere scintilla of evidence supporting the ALJ's determination. And then also in addition to the regulation I cited requiring claimants to actually identify their disability, courts can of course remand if the agency requests a remand so that the agency could consider those technical questions if there were some sort of issue. And that, again, I think reflects the current practice as well. Isn't it an important distinction between the Appeals Council and the ALJ hearing that the ALJ proceeding is the first step that sort of is when everything gets put on the table? And it seems that it might make more sense to require, you know, the waterfront to be covered there even if it isn't at the Appeals Council. Well, I disagree with that assessment. I mean, the ALJ is the third step out of four in the remedy exhaustion process. And the ALJ proceedings by regulation reassure claimants that the ALJ is going to be issue-spanning throughout the process, developing the record. That is why the agency charges the ALJ with being an investigator and not just being an adjudicator. And I think it's even clearer, actually, that there is no expectation or need for the ALJ to rely on claimants to raise issues at that stage because after the ALJ phase ends, the Appeals Council then issue spots de novo and is taking up and taking a look at issues even if claimants didn't raise them to the ALJ. So I think that that difference actually cuts in favor of making it clearer that there is no requirement for claimants to raise issues before the ALJ. Thank you. Go ahead. Oh, sorry. Justice Thomas. Thank you, Mr. Chief Justice, Ms. Harris. I understand your argument or your answer to the Chief's question about sandbagging on the back injury versus the leg injury. But let's apply that to a choice of the ALJ that the claimant does not like the first ALJ, doesn't object to that ALJ, and then later on at the council level or at the district court level or the federal court level then objects to the ALJ. Shouldn't there be some concern about that level of sandbagging? Well, I don't think so for two reasons. First of all, if there's some sort of concern about the run-of-the-mill disqualification concern for bias or prejudice, it seems quite clear that the Appeals Council actually does consider any objections that are raised to the bias of the adjudicator de novo at the Appeals Council stage under Ruling 13-1P, which is specific to that. And so I don't think there is that kind of sandbagging concern. The other reason is that if you did try to raise, say, new facts of bias, like that the ALJ had a personal stake in the case for the first time in court, that would still fall under the new evidence bar of 405G. You'd be trying to present new evidence. Unless it were both material and something you couldn't have presented before, you wouldn't be able to do that. And I also think that actually heightens the contrast with the Appointments Clause. So unlike perhaps a question of bias or disqualification, the Appointments Clause is something that is not within the agency's jurisdiction for its adjudicators and is something that this court in free enterprise and other cases has said is really beyond the agency's competence. So I think for the Appointments Clause in particular, that's all the more reason to not be concerned about some sort of sandbagging issue. The agency isn't able to give claimants a fair chance to raise that before agency adjudication, and so there is no concern with raising that for the first time in court. So there are quite a few of these. There's a possibility that there could be quite a few of these cases, Appointments Clause cases. Why don't we resurrect the de facto officer doctrine in order to be able to manage that? Well, two reasons. First of all, I think Ryder quite appropriately treated the common law history of the de facto officer doctrine as not covering the Appointments Clause because it's a structural constitutional challenge, and I think the government agreed with this, and it's a realist briefing. If you have no remedy for raising an Appointments Clause challenge, and the answer is simply the adjudicator was operating sort of under cover of law, there is never going to be any remedy for Appointments Clause violations. And I think the second reason is here we're talking about a closed universe of a few hundred cases, and there is no indication that the agency will struggle in any way in giving claimants, simply giving claimants new hearings in these settings. Thank you. Justice Breyer? Two questions that are related. One is what ground would we choose among several that you advance to say that you don't have to raise it? If the ground is the structure of the Social Security Administration, I do share the Chief Justice's suggestion that not necessarily new evidence, but lawyers are very imaginative. They're very good. You sit in your office and you think up excellent arguments that people actually have never raised before, and you bring them all to the district judges. Now, why isn't that a problem? You may not want to say anything extra that you haven't already said. If you go on the ground that, well, they couldn't consider this the ALJs, it was futile because the agency told them they couldn't, didn't the agency tell them that after your clients were involved in their cases? Do you want to say anything further about those two problems? Sure. So two points. First, taking the nature of the Social Security proceedings, I do think SIMS actually resolves a lot of the concerns with respect to whether courts are going to be facing sort of new evidence, new arguments, and have problems with them, because most errors that are being raised in court are things that arose in the ALJ decision. SIMS already held that you don't need to raise those issues to the appeals council, and so lots of questions like whether a consultative expert should have been called or how the ALJ conducted questioning are already in district court for the first time, and there doesn't seem to be any problem, and the agency hasn't created a rule since SIMS suggesting there isn't a problem. With respect to the futility issue, I don't take the government to be suggesting at any point in time that the agency would have ever been competent to adjudicate appointments clause challenges. Now, they made that elusive in January 2018 when they told ALJ specifically to say they had no power to entertain such claims, but I don't think that was in question before then, and cases like Free Enterprise as well as Eldridge and Califano in the Social Security context underscore that such constitutional questions seem well beyond the agency's competence to adjudicate. Thank you. Justice Alito? Ms. Harris, was your client hurt by the manner in which the ALJ was appointed? Yes, there is a personal interest in the appointments clause in having a constitutionally appointed ALJ because the appointments clause is a guarantee of transparency and accountability. I don't think that we would even need to show that because an appointments clause violation is structural, but the court's cases, I think, have long emphasized that the appointments clause is not just a structural constitutional guarantee. Well, is that realistic in this case? The ALJ was appointed by a lower level official and now has been reappointed along with all the others by the acting commissioner. So is this ALJ now smarter than he or she was at the time of your hearing, more inclined to be favorable to applicants like your client? Can you say that, that that's realistic? I can't say that the ALJ is different on the merits, but as Lucia recognized, it's not that there is some sort of necessary guarantee that there would be a different outcome. It is that the ALJ is accountable and transparency is incredibly important to guaranteeing that when someone is making an incredibly significant decision under the law of the United States, that person is actually accountable and there's some way of figuring out who appointed them. Why not just say in all of these cases, they must be reconsidered by the ALJ who heard them initially. The ALJ who heard them initially takes another look at the record, asks himself or herself, you know, given my new position, having been appointed by the acting commissioner, do I see this any differently? If I don't, then the original decision stands. Why isn't that sufficient? Well, because I think as Lucia recognized, it's hard for someone who's already seen the merits to take another look without being clouded by that. And I think as the court recognized in SELA law last term, appointments clause and other separation of power violations are insidious because it's very difficult to unscramble the egg once you have the process conducted in an unconstitutional manner. And so I think to give a proper remedy, Lucia did recognize that the new hearing before a different adjudicator would be an essential part of this. This seems like an enormous waste of time and money. How can you account to taxpayers and other claimants for this? If these ALJs are going to be busy rehearing cases, other claimants who've never had a shot are going to have to wait. A lot of time is going to be wasted. And I don't really see what is accomplished. Well, two points on that, Justice Alito. First of all, ALJs collectively conduct 760,000 hearings a year. They take about 30 minutes per hearing. And so I don't think it's realistic that conducting several hundred new hearings is going to impose any kind of burden or delay on the agency. Thank you. I'm sorry. Yeah, my time is up. Sorry. Justice Sotomayor? Counsel, the court in Lucia did not have to address forfeiture because the claimant raised the objection before the agency. Nevertheless, at the remedy stage, this court noted that the relief of a new hearing is usually reserved for someone who makes a timely challenge. If we rule in your favor and remand, may the courts below still deny your relief on that ground? Not an exhaustion ground, but on simply that it's not equitable? I don't think so. And I'm not sure where that power would really come from because I think Lucia does establish, you know, the question of whether there's a timely objection is whether you are able to state the appointments clause challenge on the merits. And I'm not sure I would look at the sort of timeliness as playing into the relief. If there is an appointments clause violation that a court can entertain, which should be the case here, the proper remedy for that is a new hearing before a new adjudicator. And to deprive someone of that remedy on equitable grounds, I mean, especially claimants who had no notice that they were supposed to raise the appointments clause, would seem actually grossly inequitable, even if there were some sort of power to tailor remedies in that fashion, which I'm, again, not sure where that would come from. Well, I'm thinking of Justice Alito's question. And it seems to me that whether the same ALJ decides the case or a different one does, that that's more a due process argument, isn't it, rather than an appointments clause argument? Well, I think you could see it as both. I mean, I think Lucia is recognizing that when the appointments clause infects the proceeding, it would in some way, you risk perhaps replicating the, if you simply replicate that same process that someone has already followed, it doesn't seem like much of a remedy, even simply because the person's already considered the case. And so it just isn't realistic to think that someone will look at it differently. But regardless if you put that under due process or the nature of the appointments clause, I think that is a clearly established remedy in this context and would be important for Social Security claimants in particular because there is a very high reversal rate in these kinds of cases in district court, and they can be very close. And so just another look at this. Counsel, I have one last question. Just remind me, was this petitioner represented by counsel before the agency? So all petitioners were represented by counsel in ALJ hearings. Not all of them were represented by counsel at other stages of the ALJ process. For instance, the request for review, and some of them were not represented by counsel in appeals counsel proceedings either. They had non-attorney representatives who can be people like friends or social workers or other types of non-lawyers. And so we don't think that there should be some sort of special rule simply for representing claimants. That would raise actually a lot of really tough policy questions that seem best suited for rulemaking, which again is something the agency could have done at any point since. Thank you, counsel. Justice Kagan? Ms. Harris, could I take you back to the conversation that you were having with Justice Breyer? Because I wasn't quite sure I understood your answers to him. I mean, imagine that the claim that your clients failed to raise was not this sort of legal-slash-constitutional claim, but really was related to the fact finding that the ALJ had done. So, for example, a question about the proper conclusion to draw from certain medical evidence in a case, something like that. So would you still say there's no exhaustion requirement in a case of that kind? I would because I think your hypothetical is actually squarely controlled by SIMS. The two questions in SIMS that were not exhausted, one of them was about the ALJ's potentially improper questioning of one of the witnesses, and the other was whether the ALJ had weighed the evidence correctly to determine whether to call a consultative expert. And so the question in your hypothetical, too, is something that would only be apparent from the ALJ's decision. And that is something that under SIMS already does not need to be exhausted to the Appeals Council, and that courts are already entertaining for the first time. I'm sorry. Of course, SIMS was a plurality opinion, and the fifth vote is Justice O'Connor's opinion, which really relies only on the short form that was applicable in the Appeals Council, which Justice O'Connor was worried had given claimants the wrong impression. And that they would rely on it to their detriment. So can you really just rely on SIMS for the kinds of points you're making? Well, yes. I think SIMS, first of all, does have a majority. I mean, five justices agreed that the default rule is that if an agency does have non-adversarial proceedings that don't depend on the parties to develop issues and doesn't provide notice, courts don't read in an issue-exemption rule. And Justice O'Connor's opinion did not just depend on the short form for the request, which, by the way, is materially identical for ALJ proceedings. She also noted that the agency had in no way provided notice of an issue-exemption requirement at any stage, and also that the Appeals Council would conduct a plenary review of the issues. Again, the exact same thing is true with respect to ALJs. So I think no matter how you slice and dice the SIMS opinions, you do reach the same result, which is that the holding is that you do not need to present issues to the Appeals Council if there are errors that arise from the ALJ decision, and that whether you focus on the notice dimension or the non-adversarial nature of Social Security proceedings, both of them kind of lead to the same result, which is that it is very strange for courts to imply or read in some sort of issue-exemption requirement that is in serious tension with the nature of the proceedings that the agency itself has chosen to employ, which do not depend on claimants to raise issues, and instead have the agency shouldering that burden on its own. Thanks, Ms. Harris. Justice Gorsuch? Good morning, Ms. Harris. I just have a quick factual question. That January 30, 2018, emergency message to ALJs telling them not to discuss appointment clause issues if they're raised in front of them, was that public or how did you come to find that? It was very difficult to come by because emergency messages in general are made directed at ALJs. The agency appears to have eventually made it public on sort of websites that people track Social Security emergency messages and post them, but it does not seem like the kind of thing that your average claimant, for instance, might have been able to see, let alone other people. I just want to scratch at that a little bit further and understand is there a process for publishing them or is this just like somebody's slapped it up on the website and nobody knows pursuant to what rule or how? I'm not sure, and I don't even know that it's the agency that is publishing these on its website. It's something that, again, is an internal message that it goes out just to ALJs, and so it is not public. It is instructing ALJs how to do their job according to the agency's messaging. Okay. And then I was curious about how it related to your particular clients whose proceedings I had thought finished before the ALJs before this message, but perhaps I'm mistaken about that. That is correct. So the all claimants, all petitioners, did complete their proceedings before then, but the January 2018 message is something that confirms what had been evident beforehand, which is that I don't think there's ever been a point beforehand where the Social Security Administration thought that it did have jurisdiction over Appointments Clause challenges. I think what the emergency message also illustrates is that the agency was very, very aware of the Appointments Clause problem, and so it's not like the claimants were needed to sort of draw the agency's attention to the fact that its ALJs were likely unconstitutionally appointed. The agency knew that, and in keeping with the fundamental nature of its adjudicatory process, told ALJs, you can't actually deal with the Appointments Clause, so don't do anything about it. And all of that, I think, builds up to a clear case of futility under this Court's precedence, because not only did the adjudicators not have jurisdiction over the Appointments Clause question, but they certainly had no power to remedy it. They can't reappoint themselves, of course. My recollection is that the memo went a little bit further than that, even, and said, don't just not rule on it, but don't discuss it. Mum's the word. Yes, that is correct, Justice Gorsuch. They said you're barred from discussing it, so even if you hypothetically wanted to as the ALJ or Appeals Counsel, you knew it was a problem and you wanted to tip claimants off, you couldn't have done that either. Despite your affirmative duty to help parties before you. Yes, despite that duty of helping issue spots, both before the ALJs and the Appeals Counsel. And I think that also underscores why the Social Security Policy 19-1P that the government points to is such a half-a-loaf remedy. It's not giving... It is essentially requiring people long after the time passed when anyone would be able to do anything differently. It's penalizing them for not objecting in these ALJs and Appeals Counsel proceedings. Thank you, Ms. Harris. I'm afraid my time's expired. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Ms. Harris. The government, of course, relies heavily on the background rule that it says largely controls from L.A. Tucker. If we were to rule in your favor in this case, exactly what would you have us write in our opinion about L.A. Tucker? I think you could write exactly what Sims wrote, which is that L.A. Tucker is a rule that applies in adversarial proceedings and is confined to that context because what it says is that the general rule is that you do not vacate agency decisions unless the agency had a chance to correct its error against the objection made at the time appropriate under its proceedings, which, again, just begs the question of whether there was a time appropriate to object under the particular agency proceedings. And in non-adversarial proceedings, like the Social Security Administration, there is no such time. So I think Sims' treatment in the majority portion of the opinion of L.A. Tucker would in and of itself be sufficient because Sims treated L.A. Tucker as very much consistent with the court's approach to distinguishing between adversarial and non-adversarial proceedings. Thank you, Ms. Harris. Justice Barrett? Good morning, Ms. Harris. So one of the best... I mean, Sims is obviously your best argument and its discussion of the distinction between adversarial and non-adversarial proceedings. I'm wondering how unique the Social Security Administration is. I mean, so you point out that it's non-adversarial, it's informal. You know, Sims made those points too. If we were to rule your way, would we be, you know, saying that there are other agencies in which this exhaustion of issuers' requirement did not apply? Well, I don't think that's a big concern because the two most non... sort of second-most non-adversarial agencies I can think of are the Veterans Administration and the Railroad Retirement Board, and both of them actually have dealt with those issues. The VA has an issue exhaustion rule. It is flexible in keeping with the non-adversarial nature of those proceedings. And the Railroad Retirement Board has an issue exhaustion rule only for very specific type of arguments. And so I think that just goes to show that this is an area where agencies are very capable of responding to this court's opinions or exercising their own authority and imposing an issue exhaustion requirement if that is appropriate and reflects, you know, what they want to do. They can calibrate them. They can make the sort of hard policy choices of deciding whether they want issue exhaustion to apply to some proceedings, some types of issues, some types of claimants, some types of arguments. And that is exactly what the rulemaking process seems designed to accomplish by letting different stakeholders weigh in and figure out the pros and cons of doing that. So in both of those other agency contexts, the issue exhaustion rules are imposed by regulation? Yes. One other question about the Social Security Administration. So, you know, Justice O'Connor's opinion, which was the narrowest, and so controlling under Marx, focused on lack of notice. And, you know, I'm just wondering whether, you know, how common it is in proceedings before an ALJ for a Social Security claimant to raise a constitutional issue or some sort of legal challenge that's unrelated to the facts of the disability claim. Well, my understanding is that it would be very uncommon. We certainly know with respect to the Appointments Clause that zero claimants, according to the government, raised an Appointments Clause challenge before Lucia. Only a handful did so afterwards. And it seems like it would be quite unusual for that kind of constitutional claim to be raised to an ALJ because it does not appear that ALJs have any competence to address those questions. Thank you, Ms. Harris. Oh, sorry, finish, please. Oh, no, no. So, I mean, it seems like the ALJ would just be passing it up along and waiting for a court that is competent to address those questions to do so. Thank you, Ms. Harris. A minute to wrap up, Ms. Harris? SIMS invited the Social Security Administration to adopt an issue exhaustion rule. Instead, the agency still encourages claimants to rely on ALJs and the Appeals Council to issue them. If the agency needs an issue exhaustion rule to function, one wonders why it hasn't engaged in rulemaking and at least let stakeholders weigh in. The government's appeals to equity do not add up. An exhaustion rule would disadvantage hundreds of thousands of unrepresented claimants. The government never explains why people in dire need of assistance would hold back arguments just to stand back the government. And the government acknowledges agencies lack special expertise in constitutional questions like the Appointments Clause. The government knew of the Appointments Clause problem but kept holding unconstitutional proceedings. And that conceded constitutional violation is easily fixed. Giving a few hundred claimants new ALJ hearings is a drop in the bucket for the agency. Thank you, counsel.  Thank you, Mr. Chief Justice, and may it please the court. To resolve this case, the court need only apply either of two well-established rules. The first is the 100-year-old rule that a party challenging agency action forfeits issues not raised during agency proceedings. The courts of appeals have consistently applied that rule in the specific context of Social Security ALJ proceedings for decades. Petitioners suggest that the government is asking the court to change the rules of the game. But the reality is the exact opposite. The second rule is that a party forfeits an Appointments Clause challenge by failing to raise it before the agency itself. Under the traditional de facto officer doctrine, a private party could contest the legitimacy of an official's appointment only in a direct suit against the official himself. That doctrine prevented the enormously destabilizing consequences that could otherwise result. Although the court has since loosened the doctrine, it has critically limited disruption by requiring a timely challenge before the agency. Enforcement of that rule is particularly appropriate here, where petitioners do not identify any prejudice resulting from the allegedly invalid appointment. Petitioners' primary response is to point to this court's decision in Sims. But Justice O'Connor's controlling opinion rested on her conclusion that the agency effectively misled claimants about the need to raise issues. This case is different. The regulations governing ALJ proceedings do not lull claimants into thinking they may forego raising issues. And the consequences of excusing forfeiture here would be far more dramatic. Whereas Sims involved the requirement to raise an issue before a particular adjudicator, petitioners contend that claimants may decline to raise an issue before the agency at all. The court should reject petitioners' request to work an evulsive change in the law and affirm the judgments below. Counsel, a number of amici quoted an ALJ saying that a hearing is no worse than if you and me were just sitting in your living room talking about your life. You began by saying the appointments clause concerns are well established, but I don't think they're very well known. You know, it's hard to imagine people sitting in the living room talking about their lives and saying what important a role the appointments clause has played, you know, when they were growing up. Isn't the expectation that a claimant would raise an issue under the appointments clause, which, however important to us lawyers, is pretty obscure in such a setting where the ALJs themselves view it as a very informal and casual setting? I don't think so, Your Honor. The regulations here are materially distinct from those in Sims, and they make clear that the claimant has to be an active participant, including objecting to prejudice on the part of the ALJ. And in other contexts, we require pro se claimants to abide by procedural requirements. In Woodford, for example, this court rejected arguments that unrepresented prisoners shouldn't have to exhaust properly to satisfy the PLRA exhaustion requirement. And so I don't think requiring claimants to raise this type of issue here is in any way unusual. And on top of that, there have been some suggestions that an ALJ has an affirmative duty to raise the appointments clause argument for the claimant, but that's just not correct. The ALJ has the duty to investigate issues that were raised by the reconsideration decision, but of course the appointments clause issue wouldn't have been raised by a reconsideration decision, and then has the discretion to raise additional issues. But there's certainly no duty on the part of the ALJ to raise an appointments clause challenge against himself. In one minute, give me your best shot on SIMS. Yes, Your Honor. I think SIMS is distinct in two respects. First, the regulations, as I mentioned, are different. The regulations here require claimants to note the reasons they disagree with the reconsideration decision, to object to the list of issues, to object to the ALJ's prejudice at the earliest opportunity. None of those requirements exist at the Appeals Council stage. You also have an entitlement to an ALJ hearing. You do not have an entitlement at the Appeals Council stage. Then second, I think there's the structural point, which was touched on in questions earlier, which is that the ALJ stage is the main stage. That is basically the trial. That's where all the evidence is put forward. That's where the most fulsome arguments are developed.  you don't have an entitlement to a hearing, and the Appeals Council declines to review 85% of cases. So the consequences of abandoning the forfeiture requirement here would be far more dramatic than in SIMS. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Rayner, I understand your argument differentiating, distinguishing SIMS in this case. But one suggestion we made in SIMS was that perhaps the agency could adopt a regulation on exhaustion. And I understand the provisions you just talked about, but is there a regulation on exhaustion? No, we are not advancing the argument that any particular regulation requires issue exhaustion here. And there's obviously changed costs to adopting a regulation of that kind, and I think the agency hasn't felt the need to undergo those costs given the well-established background rule. I think it's important not to lose sight of the fact that the courts of appeals have virtually uniformly applied issue exhaustion requirements to ALJ proceedings for decades. And apart from the three circuits in the circuit split under review that have sided with petitioners, petitioners have not identified a single court of appeals in history that has rejected issue exhaustion at the ALJ stage for Social Security. What is that exhaustion based on, Mr. Rayner? It's not statutory and it's not regulatory. What is it based on? Justice Thomas, it's a common law rule, as this court recognized in Sims and in L.A. Tucker, and I don't think there's anything unusual about that because it goes to the types of arguments that the courts themselves will consider, and obviously those are anodyne. Our legal system is littered with those sorts of rules. For example, the rule that a court will typically only consider things that were pressed or passed on below, or the rule that a court won't consider arguments raised for the first time in a reply brief. Those are all common law rules. We acknowledge, because this is a common law rule rather than a regulatory rule, that it is subject to common law exceptions, such as futility and so forth. The petitioner makes quite a bit of the distinction between adversarial hearings and inquisitorial hearings. Could you address that or respond to that briefly? Yes, Justice Thomas. Obviously, in Sims, the court did recognize that as a relevant consideration, but we agree with Justice Barrett that Justice O'Connor's opinion in Sims was controlling, and she was only willing to dispense with the forfeiture rule because, on her reading, the Social Security Administration had effectively misled claimants. And I don't think there's any plausible claim here, given the regulations I've cited and given other aspects of the proceeding, that the agency has misled claimants. So the non-adversarial aspect of the proceedings would not alone be enough. And I just want to note that L.A. Tucker, of course, is not the only basis on which this court could rule in our favor. Ryder and Lucia and the de facto officer doctrine are an analytically independent basis for ruling for the government, and the rule in those cases doesn't depend on the non-adversarial quality of the agency proceedings. Thank you. Justice Breyer? Good morning. I thought you said, which you did, that this is basically a common-law area issue exhaustion, and I thought, I'm not positive, but I thought that there was a pretty well-established exception to the need to exhaust an issue where it is a constitutional issue and maybe another one where it's feudal. Well, I mean, here you have a memo of some kind saying don't even decide this, the ALJs, and maybe that was a well-recognized idea before. They shouldn't decide it. Feudal and also constitutional issue, fundamental structure, not within the area of the expertise of the ALJ. All right, so what do you do with those, if I'm right? Justice Breyer, we acknowledge that there's a futility exception, but courts have construed it narrowly. It only applies when there is utter futility. In Weinberger v. Salfie, for example, the court said that it would not substitute its conclusion of futility for the Secretary's, and obviously here, the Commissioner does not think this was feudal, and indeed it wasn't because the Commissioner had the power to ratify ALJs, which she eventually did. As to the constitutional issue that you note, we do not agree that there is a categorical exception for constitutional arguments. Richardson required exhaustion of a constitutional argument in the social security context, and all of the cases, including Weinberger v. Salfie, Matthews v. Diaz, Matthews v. Eldridge, all of those depend on particular circumstances, such as whether additional delay would inflict irreparable harm on the claimant, that are not present here. So we would strongly dispute the existence of a categorical constitutional exception. Thank you. Justice Alito? My questions have been covered, thank you. Justice Sotomayor? So have mine. Justice Kagan? Mr. Raynor, I'd like to go back to Justice Thomas' question to you. You said, well, you didn't really need to adopt a regulation. I guess I'm just wondering about that because you told the court in Sims, I think, that the SSA had the matter of issue exhaustion under review, and the court specifically noted in that opinion that, of course, SSA could adopt a regulation. I mean, if this matters so much to SSA, it seems as though it would not have taken a whole lot of effort to adopt a regulation. It's certainly possible, Justice Kagan, that the agency could have done so, and we agree that is a step it could take. But, again, there are change costs associated with any type of overhaul like that, and particularly in this context, where the circuit case law has been virtually unbroken for literally decades. I think the agency has justifiably felt that it can rely on the background rule without seeing to overhaul that through a regulation. Well, how much is it relying on the background rule? How often does SSA raise an exhaustion claim in court? I think it varies, Your Honor, depending on the types of claims that are being raised by claimants. So, the agency, for example, is much more likely to raise a forfeiture argument against a represented claimant than against an unrepresented claimant. And then, of course, there are certain issues that come up periodically, like this one, like the appointments clause issue, where it will be forced to raise exhaustion basically across the board to ward off a large number of claims. And I think it's important to note just one point about the number of claims here. Petitioners argue repeatedly that there's not a large number of claims remaining in the pipeline, but I think it's a little bit unfair to piggyback on our success because we succeeded in having dismissed, in the majority of districts that addressed this, the appointments clause issue on the ground of forfeiture. And so we won those, and now petitioners are asserting, well, there's not many left. But there were a lot at the outset, and if the court adopts petitioner's rule, then we wouldn't have that defense available going forward. Just to give you a general rough picture, at the time Lucia was decided, if you look at the cases that were pending before the appeals council, they were within the 60-day limitations period and they were pending in district court. I take it under petitioner's rule, all of those cases could have raised an appointments clause challenge. That was on the order of about 135,000 cases. So the numbers here are quite significant. Thank you, Mr. Raymer. Justice Gorsuch? Good morning, Mr. Raymer. My question is a factual one, and again, it's about the 2018 emergency message. Was that purely an internal document that somehow got out in the public, or is that something that was published pursuant to notice and comment, or something in between? It's something in between, Your Honor. Those messages are directions to ALJs, and some of them are made public and some of them are not. That one was made public, although I am not aware of the precise date at which it became publicly available. For purposes of this case, of course, it was issued after all of the petitioners. I understand that. Do you have some sense of when it was made publicly available? I do not have the date. No, I do not, Your Honor. Okay. Thank you, Mr. Raymer. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Raymer. You rely heavily, with respect to Sims, on Justice O'Connor's opinion, which was concurring in part and concurring in the judgment. Ms. Harris points out that Justice O'Connor joined Part 2A of Justice Thomas' opinion, making that a majority opinion, and that itself is sufficient for the rule that Ms. Harris is advocating here. Can you respond to that? Yes, Justice Kavanaugh. Obviously, a majority did join that part, and that part of the opinion did acknowledge that the adversarial quality of the proceeding is a relevant consideration. But I think it's pretty clear that Justice O'Connor didn't think that that was enough to decide the case. And so, if you view her opinion as controlling, which I think is undisputed, then that's not dispositive. The court has to go further and ask an additional question, and under her opinion, that additional question is, did the agency effectively mislead the claimant? And I don't think petitioners can make that showing here. And again, I will just point out that L.A. Tucker and Sims, that's one way to resolve this case, but the de facto doctrine is an additional basis for ruling in favor of the government, and petitioners have very little response to the timeliness requirement articulated in Ryder and Lucia. You've given us alternative ways you could win if you were to lose. What's your preferred approach? Well, Justice Kavanaugh, I obviously reserve my objection to that premise, but I appreciate the question, and I think we would prefer a ruling that obviously does as little damage as possible in cases other than this one. And so I think in that world, the things the court should focus on would be that it's not only non-adversarial, but there's no issue of exhaustion regulation, and this is a structural constitutional objection where the claimant didn't have direct access to the agency actor that could remedy the issue, namely the commissioner. Appreciate the answers, Mr. Raynor. Thank you very much. Justice Barrett? Good morning, Mr. Raynor. So I have a question about the adversarial, non-adversarial distinction, too. As Justice Kavanaugh just pointed out, that portion of Justice Thomas' opinion did command a majority of the court. One of the reasons, you know, in an adversarial system, the issue exhaustion requirement makes sense is that both sides have every incentive to raise all the issues that would benefit them. In this kind of proceeding, which is non-adversarial, where a claimant has come to the Social Security Administration and come to the ALJ wanting him to give, or her, to give the claimant benefits, what incentive does the claimant have to say to the ALJ, you know, you actually can't give me benefits and you can't adjudicate this proceeding because your appointment should have been made under the appointments clause, especially when, you know, the claimant's interest is in speed of getting the disability benefits as soon as he or she can. So if you could address that. Yes, Justice Barrett. And if petitioners were correct that they had a real personal interest in having this ALJ appointed according to the appointments clause, I think they would have an incentive to raise it early. But your question highlights the threat of sandbagging here. I agree with you. As a practical matter, they don't have an incentive to raise this early. This isn't like a medical argument that they want to raise early to obtain their benefits early because whether the ALJ was appointed under one of the methods specified in the appointments clause or not really has no effect on their likelihood of success on the merits. So in this context, the petitioners and other claimants have every incentive to litigate on the merits through the ALJ and agency proceedings, and then once they get to district court to pull out the appointments clause argument to obtain a free do-over if they weren't successful the first time around, which is precisely what is occurring here. So I agree with you about the practical incentives, and I think that confirms the threat of sandbagging in this particular context. Well, it also raises the question of why an issue exhaustion requirement makes sense in this non-adversarial context. But let me put that aside because I do want to ask you, do you agree with Ms. Harris that the only other agencies that this holding might affect would be the VA or the Railroad Retirement Board? Your Honor, I'm not willing to make a statement that categorical, and with respect, I'm a little hesitant to wade too much into other agencies because there's a lot of litigation ongoing involving those other agencies, and whether or not their regulations require issue exhaustion. So obviously, to the extent courts rejected those arguments, then we would be reliant on the common law rule. But just to be clear, the Social Security Administration is obviously far and away the most important for this question. I mean, it has 1,600 ALJs. The total in the federal government combined is only about 1,900, and it adjudicates an enormous number of claims compared to other agencies. Thank you, Mr. Raynor. Mr. Raynor, you have about 10 minutes left if you want to proceed with your argument. Thank you, Mr. Chief Justice. I'd like to focus on just a couple of topics. Petitioner's presentation has focused heavily on the notion that it is unfair to expect unrepresented claimants to raise legal challenges before the agency. This court has already rejected that argument in Woodford, which involved administrative exhaustion by unrepresented prisoners. The baseline rule in our legal system is that if a party chooses to proceed pro se, he is still responsible for complying with basic procedural requirements. Mr. Raynor, I wonder if there's a sliding-scale approach to this. I mean, it's one thing to expect a pro se plaintiff not to raise an obscure lawyerly issue like the Appointments Clause, but maybe different under the Due Process Clause. I mean, if it's an issue that, you know, so-and-so told me that I wasn't entitled to these damages or I never got the letter from the government saying this, but they don't raise that until the district court. I mean, it seems to me that that might be a stronger argument for waiver than the Appointments Clause. Is there any basis for such a sliding-scale approach? I don't think so, Mr. Chief Justice. I think the best approach here, which requires the least policymaking by the courts, is just a clear background rule. But if the court wanted to calibrate a rule to the specific circumstances, the issues to focus on here would be twofold. One is that this isn't the kind of question that the ALJ has a duty to raise, and so there's all the more onus on the claimant to raise it. And then second, I think the main thing that should drive the analysis in this case is the fact that there's no allegations of prejudice whatsoever. And so the unfairness, the alleged unfairness to the claimant, really should not be the motivating factor here because, as Justice Alito pointed out, there's effectively no purpose in this do-over. It's just imposing additional labor on the agency for no real benefit. Well, but you really need someone in this position to be able to raise the Appointments Clause concern or it just isn't raised. I mean, it is certainly designed to protect the separation of powers, which is designed to protect the liberty of all of us. So I think there is prejudice in that respect. Right. Yes, Your Honor. We're not trying to downplay the significance of the Appointments Clause, but I think the remedy for an Appointments Clause violation has to be understood against the history of remedies and traditional de facto doctrines. And the only way to obtain a remedy for this kind of alleged harm was through a writ of quo veronto, where the officer was a direct party in the suit and another party could obtain prospective relief. Now, I think the Court eventually decided in a series of cases in the late 20th century, culminating in Ryder, that that rule was a little too strict and it loosened it and it adopted a rule that as long as you raise your argument before the adjudicator, before he acts on your case, then that preserves the argument and you can obtain relief on direct review. Counsel, if the only reason for providing relief in a case like this is to provide an incentive for parties to raise Appointments Clause claims, does our case law allow us to draw a distinction between the party who gets to the Supreme Court or perhaps a limited category of parties who are similar and everybody else who might be covered by an eventual holding that a category of appointments was unconstitutional? Your Honor, I think there are certain lines the Court could draw. It could apply its ruling prospectively, perhaps. Of course, there are hundreds of these still pending in the lower courts, but that would eliminate many of the prior ones. It could adopt a rule in a similar vein that collateral attacks aren't permissible. But I think the right rule is the one the Court adopted in Ryder, which is that you have to raise it before the adjudicator, before he acts on your case, and that provides a sufficient incentive to raise these kinds of claims, and that requirement obviously wasn't satisfied here. On the history of the de facto doctrine, I'd also like to just make one additional note, which is that petitioners suggest that it traditionally did not apply to constitutional claims, and that assertion is patently ahistorical. The Court applied it to constitutional claims in Ex Parte Ward. Norton contains one of the Court's most extended discussions of the de facto doctrine, and that discussion makes clear that it applies to constitutional claims. In distinguishing some of those cases, Ryder mentioned that they didn't involve constitutional claims. There it was talking about McDowell and Ball, which were statutory challenges. And the perspective rule that Ryder announces is that you have to raise a timely challenge to the adjudicator. And so we disagree that historically this wouldn't have covered constitutional claims, and if petitioner's claim doesn't fall within the narrow exception that Ryder adopted, which it plainly does not, then it falls within the background de facto rule and is categorically barred. Petitioners have also suggested at points that the Court should not fix a problem of the agency's own making, but that inverts what's actually going on here. This Court has applied a background exhaustion rule for 100 years. The Courts of Appeals have uniformly applied that rule to Social Security ALJ proceedings for decades. And apart from the decisions in the circuit conflict under review, all of which rely on reasoning specific to the appointments clause, petitioners haven't identified a single Court of Appeals decision in history rejecting the forfeiture rule as applied to ALJ hearings under the Social Security Act. The agency has reasonably relied on that well-established and virtually unquestioned rule, and it's petitioners that are asking this Court to change the rules of the game. Mr. Rayner, are there any judicial decisions after Sims which accepted the government's argument on this question? Yes, Justice King. And there's about five Courts of Appeals that have continued to apply forfeiture at the ALJ stage after Sims. Those cases are listed at pages 30 and 33 of our brief. And petitioners have suggested that there are guardrails that would prevent any type of factual issues from arising unexhausted to the Courts of Appeals. But I think as those decisions indicate, that's just not the case. Oftentimes there will be factual arguments that the ALJ failed to properly develop the evidence or failed to reconcile alleged conflicts in the evidence, and that will become apparent to the claimant during ALJ proceedings, and the claimant will be able to object at that time. Counsel, how many of those cases that you're referencing from the Court of Appeals didn't rely on other statutory or regulatory exhaustion requirements that are in place? Justice Sotomayor, all the cases I'm talking about were in the Social Security context, so those five circuits were all relying on the common law rule because the government has not asserted that there is a regulatory or statutory issue exhaustion requirement here. And so in this context, in the Social Security context, I think Petitioner's argument really just boils down to SIMS. SIMS does not control this case. The regulations governing ALJ and Appeals Council proceedings are meaningfully different. The ALJ regulations require claimants to list the reasons they disagree with the reconsideration decision, to object to the list of issues contained in the notice of hearing, to object to any prejudice on the part of the ALJ at the earliest opportunity. The Appeals Council regulations require none of those things. There's simply no plausible argument that claimants might be misled into thinking that they are entitled to sit on their hands throughout ALJ proceedings. And under Justice O'Connor's controlling opinion, misleading is what is required. The consequences of Petitioner's position here would also be far more dramatic than they were in SIMS. In SIMS, the question was whether a claimant needed to raise issues before a particular adjudicator, but here the question is whether a claimant needs to raise issues before the agency at all. If the Court has no further questions, then I'll just close briefly by noting that there are two independent grounds for affirming the judgments below. First, the Court can simply decline to make an exception to the longstanding background rule that a party must raise an issue before the agency in order to preserve that issue for judicial review. SIMS doesn't displace that rule in this particular context. Second, the Court can apply Ryder and Lucia's requirement that a party raise an appointments challenge before the relevant adjudicator before that adjudicator acts on his case. Although Petitioners have suggested at points that Ryder and Lucia can be explained by agency-specific exhaustion rules, that argument ignores the actual reasoning of those opinions which do not cite any such rules. Cases like this one that don't fall within the narrow exception adopted by Ryder are barred by the de facto doctrine. On either of these independent grounds, the Court should affirm the judgments below. Thank you. Thank you, Mr. Raynor. Ms. Harris, rebuttal? Three quick points. First of all, the government's explanation for why the Social Security Administration has not adopted an issue exhaustion rule does not make a ton of sense. The idea that the agency has not been operating against the backdrop of SIMS but is instead relying on five court of appeals that have purported to require at least issue exhaustion for some people doesn't quite work out. The circuits are either not acknowledging SIMS and therefore requiring exhaustion of issues that SIMS itself would cover because they are errors that arose only in the ALJ decisions, or they're really explainable by or feasible to allow new evidence in proceedings, which is already covered by a lot of different provisions of the Social Security Act. And so it's pretty curious that if the agency were in fact operating under the assumption that issue exhaustion was in fact the rule of the road for ALJ proceedings, why would ALJs ask for an issue exhaustion rule? And why would the agency never tell claimants about such a rule if that is in fact the reality on the ground? The government points to purported changed costs of not adopting a rule. I'm not sure what changed costs entail, but it seems like engaging in rulemaking where there's notice and comment and people can weigh in about the costs of unrepresented claimants in particular of not knowing that they have to raise issues to ALJs and how people are supposed to navigate obtaining counsel, what the penalties are, would seem like something that the agency would need to consider instead of trying to ask courts to read in a requirement that seems so fundamentally in tension with the regulations that the agency has adopted. Second of all, the government points to a lot of numbers and projections with respect to stability in suggesting maybe 135 cases could have raised the appointments cost problem. But there are only 18,000 cases in court every single year for social security claimants of any type. Forty-five percent of those get reversed on other grounds. And so the numbers, even assuming that all of the remaining cases involve appointments cost challenges, are not particularly high. The Nader brief, I think, explains why that is often the case. And any numbers here, again, are of the government's own making. The government knew of the appointments cost problem and simply allowed ALJs who were unconstitutionally appointed to keep adjudicating these cases. And if there are concerns with respect to the breadth of a SIMS-based holding, of course, there are a number of narrower off-ramps, both for futility and the established rule that constitutional questions are not subject to issue exhaustion. Finally, a point on the remedy. The government seems to want this court to tinker with Lucia remedy for appointments cost challenges. But I don't think the government disputes that if it were proper to hear an appointments cost challenge on the merits, the new hearing before a new ALJ should be the remedy. And I'm not quite sure where they are getting the authority to tinker with exactly what people in claimant's shoes would get. Thank you, counsel. The case is submitted.